772 So.2d 417 (2000)
STATE of Alabama
v.
The AMERICAN TOBACCO COMPANY et al.
1981413.
Supreme Court of Alabama.
April 14, 2000.
Rehearing Denied May 19, 2000.
*418 Bill Pryor, atty. gen., and Raymond L. Jackson, asst. atty. gen., for appellant.
Walter R. Byars, Montgomery; E. Ted Taylor of Taylor & Taylor, Birmingham; Larry W. Morris, Alexander City; and Michael J. Evans, Birmingham, for appellees.
HOUSTON, Justice.[1]
The State of Alabama appeals from an order of the Montgomery Circuit Court awarding $2,011,160.36 in attorney fees and as reimbursement for expenses to five attorneys who, at the request of former Governor Fob James, filed a lawsuit against the tobacco industry shortly before Attorney General Bill Pryor and other state attorneys general negotiated a national settlement of pending and impending litigation against the tobacco industry.[2] Governor James hired these attorneys on November 12, 1998, pursuant to Ala.Code 1975, § 41-15B-2(i); he authorized them to file the action to recover tobacco-related damages on behalf of the State. (These attorneys will hereinafter be referred to as "James's attorneys.") Governor James entered into a contingency-fee contract with the attorneys. That contract authorized an attorney fee of up to seven percent of the total amount of any recovery on behalf of the State and provided for the reimbursement of expenses; however, the contract specifically provided that "if a proposed settlement is reached by the Attorney General without the Attorneys' substantial participation, no attorneys' fee will *419 be paid to the Attorneys." This contract was not submitted for review to the Contract Review Permanent Legislative Oversight Committee. See Ala.Code 1975, § 29-2-40 et seq. Shortly after the tobacco industry had entered into a national settlement with the attorneys general of the various states, including Alabama, Attorney General Bill Pryor discharged James's attorneys and dismissed the action they had filed at the request of Governor James. This appeal concerns only the trial court's sua sponte order requiring the State to pay James's attorneys in excess of $2 million from the first $38,787,140 payment to the State from proceeds generated by the national tobacco settlement and granting the attorneys a lien against those proceeds for the amount of the award. These proceeds are earmarked for potential deposit into the Children First Trust Fund. See Ala.Code 1975, § 41-15B-2(c), as amended by Ala. Acts 1999, Act No. 99-390.
The State raises two issues: (1) whether the trial court erred in ruling that the contingency-fee contract executed by Governor James and his attorneys was exempt from review by the Contract Review Permanent Legislative Oversight Committee, despite what the State says is plain language in §§ 29-2-41 and 29-2-41.2(b) indicating that the contract was void ab initio; and, alternatively, (2) whether the trial court erred in ruling that James's attorneys had "substantially participated" in the national tobacco-settlement negotiations and therefore that they were entitled to a substantial fee under the contract, notwithstanding admissions by James's attorneys that they had not been allowed to participate in those negotiations and without regard to the provisions of the national tobacco settlement that created a separate procedure for paying fees to attorneys involved in the settlement negotiations.
We note at this point that where the facts are not in dispute and we are presented with pure questions of law, this Court's standard of review is de novo. See Ex parte Graham, 702 So.2d 1215, 1221 (Ala.1997); Beavers v. County of Walker, 645 So.2d 1365, 1372 (Ala.1994).
With respect to the State's first issue, the trial court's order provides:
"The Attorney General conceded that Governor James had the authority to file this lawsuit and to hire [James's attorneys], and the accuracy of the hours and fees submitted by [James's attorneys], yet offered no evidence to dispute these claims, but relied solely upon two legal contentions:
"(1) That the contingency fee contract was void ab initio for failure to file the contract with the Contract Review Permanent Legislative Oversight Committee relying on Ala.Code § 29-2-41; however, that statute is not applicable to the instant contingency fee contract which was not a contract `to be paid out of appropriated funds.' Accordingly, the Court finds that the contingency fee contract for legal services to be provided by [James's attorneys] was not required to be filed with the Committee. As Governor James possessed statutory authority to enter into the contracts for legal services to be performed by [James's attorneys], the contingency fee contracts were valid and were binding on the State of Alabama, at least until terminated by the Attorney General."
We disagree.
The parties' basic point of contention is whether §§ 29-2-40 through 29-2-41.3, when read together, required that the contingency-fee contract be submitted for review to the oversight committee or whether the contract was exempt from review because any potential attorney fee or reimbursement for expenses was not to be "paid out of appropriated funds, federal or state, on a state warrant issued as recompense for those services." See § 29-2-41.
"In determining the meaning of a statute, this Court looks to the plain meaning *420 of the words as written by the legislature. As we have said:
"`"Words used in a statute must be given their natural, plain, ordinary, and commonly understood meaning, and where plain language is used a court is bound to interpret that language to mean exactly what it says. If the language of the statute is unambiguous, then there is no room for judicial construction and the clearly expressed intent of the legislature must be given effect."'
"Blue Cross & Blue Shield v. Nielsen, 714 So.2d 293, 296 (Ala.1998) (quoting IMED Corp. v. Systems Eng'g Assocs. Corp., 602 So.2d 344, 346 (Ala.1992)); see also Tuscaloosa County Comm'n v. Deputy Sheriffs' Ass'n, 589 So.2d 687, 689 (Ala.1991); Coastal States Gas Transmission Co. v. Alabama Pub. Serv. Comm'n, 524 So.2d 357, 360 (Ala. 1988); Alabama Farm Bureau Mut. Cas. Ins. Co. v. City of Hartselle, 460 So.2d 1219, 1223 (Ala.1984); Dumas Bros. Mfg. Co. v. Southern Guar. Ins. Co., 431 So.2d 534, 536 (Ala.1983); Town of Loxley v. Rosinton Water, Sewer, & Fire Protection Auth., Inc., 376 So.2d 705, 708 (Ala.1979). It is true that when looking at a statute we might sometimes think that the ramifications of the words are inefficient or unusual. However, it is our job to say what the law is, not to say what it should be. Therefore, only if there is no rational way to interpret the words as stated will we look beyond those words to determine legislative intent. To apply a different policy would turn this Court into a legislative body, and doing that, of course, would be utterly inconsistent with the doctrine of separation of powers. See Ex parte T.B., 698 So.2d 127, 130 (Ala.1997)."
DeKalb County LP Gas Co. v. Suburban Gas, Inc., 729 So.2d 270, 275 (Ala.1998).
Section 29-2-41.2(b) is clear on its face: "Notwithstanding any other provisions of [Article 3, Chapter 2, Title 29], all contracts for employment of an attorney to provide legal services ... shall be reviewed by the [contract review oversight] committee," with the sole exception of "contracts for appointment of attorneys for the Department of Transportation for right of way condemnation cases." (Emphasis added.) It is clear from our examination of the five sections of Article 3 dealing with the contract review oversight committee that the Legislature did not intend to limit the committee's oversight to contracts for legal services that would be "paid out of appropriated funds, federal or state, on a state warrant issued as recompense for those services." See § 29-2-40 through § 29-2-41.3. Therefore, we hold the contingency-fee contract at issue here void under the express terms of § 29-2-41: "Any contract made by the state or any of its agencies or departments in violation of this section and without prior review by the committee of either the contract or the letter of intent to contract shall be void ab initio." Our holding is based on the Legislature's clear expression of intent that the state not be allowed to contract for certain services unless the contracts for those services are reviewed by the committee.
We note that James's attorneys argue that the title to Act No. 95-652, which amended § 29-2-41.2, creates an ambiguity in the language contained in that Act. The title reads:
"[An Act] Amending Section 29-2-41.2 of the Code of Alabama 1975, to provide procedures for review of certain legal services contracts by the Legislative Contract Review Oversight Committee."
(Emphasis added.) The pertinent portion of the body of the Act, which is codified as § 29-2-41.2(b), reads:
"Notwithstanding any other provisions of this article, all contracts for employment of an attorney to provide legal services, including contracts involving an attorney providing legal services under an agreement with the Attorney General, shall be reviewed by the committee. Provided, however, contracts *421 for appointment of attorneys for the Department of Transportation for right of way condemnation cases are exempt from the provisions of this Act."
(Emphasis added.) James's attorneys contend that the word "certain" in the title conflicts with the word "all" in the body. In other words, they argue that the preamble states the Legislature's intent that only "certain" legal-services contracts be reviewed by the committee, not "all" legal-services contracts, as the language of the body of the Act states. They argue further that § 29-2-41 specifically exempts a legal-services contract, such as theirs, that would not be paid out of appropriated funds. Section 29-2-41 provides: "The committee shall have the responsibility of reviewing contracts for ... professional services with private entities or individuals to be paid out of appropriated funds, federal or state, on a state warrant issued as recompense for those services."
However, James's attorneys overlook the last sentence of § 29-2-41.2(b), which came from Act No. 95-652: "Provided, however, contracts for appointment of attorneys for the Department of Transportation for right of way condemnation cases are exempt from the provisions of this article." This exemption of a particular kind of legal-services contract would preclude the Legislature from using the word "all" in the title. The word "certain" is logical and unambiguous as it is used in the title. Because the title of the Act and the body of the Act, when read together, are unambiguous, there is no need to look to the title when interpreting § 29-2-41.2(b). See Hamrick v. Thompson, 276 Ala. 605, 609, 165 So.2d 386 (1964); Newton v. City of Tuscaloosa, 251 Ala. 209, 218, 36 So.2d 487 (1948).
With respect to the State's second issue, the trial court stated in its order:
"The evidence is undisputed that [James's attorneys] made several substantial contributions to bringing about the settlement which constitute `substantial participation' by [James's attorneys]. The undisputed evidence is that the tobacco defendants did not agree to a settlement with Alabama until [Governor James's] lawsuit was filed; this lawsuit was instrumental in bringing about the tobacco settlement with Alabama; [James's attorneys] saved the State from a potential fee claim by attorneys representing plaintiffs in [Blaylock et al. v. American Tobacco Co. et al., (Montgomery Circuit Court, CV-96-1508)]; [James's attorneys] advised Governor James to consent to the takeover of this litigation and the tobacco settlement by the Attorney General in order to permit settlement to be consummated by the Attorney General on behalf of the State; this litigation included both smoking and smokeless tobacco and sought equitable relief, including injunctive relief against promoting tobacco sales to minors, and presented the only claim by the State against smokeless tobacco defendants; and this litigation made the State potentially eligible for a share or larger share of the Strategic Contribution Fund to be awarded under the settlement agreements in proportion to each state's active participation. The significance of the instant tort litigation filed by Governor James was acknowledged by Counsel for the tobacco industry in their refusal to accept a release of the contract liability pursued by the Attorney General without a final release of liability based on the tort and equitable claims filed by Governor James. Based on the foregoing, the Court finds `substantial participation' by [James's attorneys] in bringing about the settlement approved by this Court."
Once again, we disagree. Even assuming that the contract was not void under § 29-2-41, James's attorneys would have no claim for a fee under the contract because the undisputed evidence established that they did not "substantially participate" in the Attorney General's negotiation of the national tobacco settlement. As *422 previously stated, the document on which the attorneys relied clearly states: "Provided, if a proposed settlement is reached by the Attorney General without the Attorneys' substantial participation, no Attorneys' fees will be paid to the Attorneys." Walter Byars testified as follows:
"Q.... [Y]ou were not privy to any of the negotiations that had occurred between state attorneys general and the tobacco industry that produced that agreement; is that correct?
". . . .
"A. I did not participate in the negotiations, nor did anyone in this team that I know of, with the tobacco defendants. We weren't given that opportunity."
We can find no evidence in the record that refutes Mr. Byars's testimony; therefore, we find no evidence to support the trial court's conclusion that James's attorneys "substantially participated" in the negotiation of the national tobacco settlement. Likewise, the record does not indicate that the mere filing of the action by James's attorneys in any way assisted the attorney general in reaching a settlement with the tobacco industry. To the contrary, the undisputed evidence indicates that James's attorneys vigorously opposed Alabama's entering into the settlement, which, when James's attorneys filed their action (November 12, 1998), was imminent.
Therefore, the trial court had no sound legal basis for ordering that over $2 million in attorney fees and expense reimbursements be paid to James's attorneys. Based on our examination of the record and the briefs, we conclude that any argument in favor of authorizing the withdrawal of such a substantial amount of money from funds earmarked for potential deposit into the Children First Trust Fund (which was established to benefit "at-risk children," see Ala.Code 1975, § 41-15B-1 et seq.), in order to pay for the particular legal services that were rendered here (the filing of a lawsuit that was opposed by both the Attorney General and the incoming Governor), is untenable. With no contractual underpinning to support an award, we will not uphold the award of a fee that breaks down to $2,051.50 per hour for each attorney; for one attorney's paralegals; and for another attorney's "staff time."
We recognize, however, that § 41-15B-2(i) states that the Governor has the authority to "file any litigation necessary to effectuate the compelling interest of the State of Alabama to recover tobacco-related damages incurred by the state or pursue any other legal cause of action in which the state has an interest," and that Governor James did authorize these attorneys to file an action on behalf of the State.[3] Whether that course of action was wise or appropriate is not for us to decide. In Alabama State Federation of Labor v. McAdory, 246 Ala. 1, 9, 18 So.2d 810, 815 (1944), this Court stated that "[a]ll ... questions of propriety, wisdom, necessity, utility, and expediency are held exclusively for the legislative bodies, and are matters with which the courts have no concern." We heed this same admonitionfor the courts to decide issues involving power, not wisdom or expediencywhen we are dealing with a decision such as this one by the head of the executive department of state government. At oral argument, Mr. Byars informed the Court that he had been paid $125 per hour for time he had spent preparing a complaint he had filed against the tobacco defendants before any "contract" was entered into by Governor James and James's attorneys. It is undisputed that on this contract James's attorneys spent 838.9 hours of attorney time; that members of their staffs spent 136 hours of staff time; and that James's attorneys incurred $10,879.86 in expenses at the behest of Governor James and on behalf of the State, for which they have not been paid. Therefore, we hold that, under *423 the doctrine of quantum meruit, James's attorneys are entitled to a reasonable fee. From our perspective, a reasonable fee should be based on no more than $125 per hour for the time spent on the case by an attorney ($104,862.50); no more than $75 per hour for the time spent on the case by an attorney's support staff ($10,200); plus documented expenses ($10,879.86). Our examination of the record indicates that a fee of more than $115,062.50, in addition to a reimbursement of $10,879.86 for expenses incurred, would be unreasonable as a matter of law. Under the circumstances (the attorneys' authorized legal challenge was thwarted by the Attorney General's settlement and his discharge of them as counsel for the State), we feel compelled, in accordance with general equitable principles, to allow an attorney's fee of this reduced amount to be paid to James's attorneys.
For the foregoing reasons, the trial court's order is reversed and the case is remanded for entry of an order consistent with this opinion.
REVERSED AND REMANDED WITH INSTRUCTIONS.
HOOPER, C.J., and MADDOX and BROWN, JJ., concur.
SEE, J., concurs in the result.
COOK, JOHNSTONE, and ENGLAND, JJ., dissent.
LYONS, J., recuses himself.
JOHNSTONE, Justice (dissenting).
I respectfully dissent from the reversal of the attorney fee judgment entered by the trial court. My rationale consists of three elements. First, the contingency fee contract is legal, valid, binding, and not void. Second, the record supports the conclusion that, but for the services and participation of "James's attorneys," the tobacco defendants would have escaped liability to the State of Alabama entirely and would have avoided the payment of any compensation or settlement proceeds whatsoever to the State of Alabama. And, third, the sum awarded as the attorney fee by the trial court is reasonable and is, indeed, small in comparison with the multi-billion dollar recovery; and the amount and reasonableness were unchallenged in the trial court. A chronology of all the pertinent facts and an analysis of the relatively simple law will demonstrate that the judgment should be affirmed.
In 1994, the State of Mississippi sued the tobacco industry to recoup Medicaid funds spent for the treatment of tobacco-related illnesses. Thereafter, various other states filed litigation against the tobacco industry.
In May 1996, then Governor Forrest "Fob" James and then Attorney General Jeff Sessions appointed a task force to determine whether Alabama had a meritorious claim against the tobacco industry. In June 1996, the authorized agent and representatives of Philip Morris, Inc., R.J. Reynolds Tobacco Company, Brown and Williamson Tobacco Corporation, and Lorillard Tobacco Company sent to then deputy Attorney General (and now Attorney General) Bill Pryor a letter that explained their legal position regarding a "lack of merit of a Medicaid reimbursement suit against" them. On October 2, 1996, the task force, including Mr. Pryor, sent to Governor James a confidential and privileged report recommending that Alabama not file litigation against the tobacco industry because "[e]xpensive, risky, and lengthy litigation is not the proper vehicle to combat these public finance, health, and social issues." Report of the Task Force on Tobacco Litigation, 27 Cumb. Law Rev. 577, 652 (1996-97). The report of the task force was not released to the media.
In November 1996, the voters of Alabama elected Attorney General Sessions to the United States Senate, and, on January 2, 1997, Governor James appointed Bill Pryor to be Attorney General, to serve the remainder of Sessions's term. At the end of February or the beginning of March *424 1997, a reporter for the Birmingham News asked a representative of Attorney General Pryor whether the task force had submitted a report to the Governor and the Attorney General. Attorney General Pryor "contacted" Philip Morris, R.J. Reynolds, Brown and Williamson and Lorillard and informed them that a member of the news media had requested a copy of the report of the task force. He also informed them that the report was critical of the Medicaid reimbursement lawsuit filed against them by attorneys general of other states, and that, if he released the report, he would send them a copy of it. Philip Morris, R.J. Reynolds, Brown and Williamson, and Lorillard informed Attorney General Pryor that they intended to defend all lawsuits vigorously. However, they assured Attorney General Pryor that, in the event of a settlement of any of the lawsuits, the citizens of Alabama "would not be disadvantaged by not having filed a similar suit."
On March 6, 1997, Attorney General Pryor gave a reporter for the Birmingham News a copy of the confidential and privileged report of the task force, and on March 7, 1997, Attorney General Pryor gave the same reporter an exclusive interview. Attorney General Pryor also sent a copy of the report of the task force to Philip Morris, R.J. Reynolds, Brown and Williamson, and Lorillard. On March 10, 1997, Philip Morris, R.J. Reynolds, Brown and Williamson, and Lorillard filed a copy of the report of the task force as defensive material in the Mississippi Medicaid reimbursement lawsuit pending in the Supreme Court of Mississippi. On March 11, 1997, Philip Morris, R.J. Reynolds, Brown and Williamson, and Lorillard contacted Attorney General Pryor, praised the report of the task force, and stated again that, in the unlikely event of settlement, Alabama would not be disadvantaged for failing to file a lawsuit. In reliance of the representation of Philip Morris, R.J. Reynolds, Brown and Williamson, and Lorillard, Attorney General Pryor "publicly criticized the use of the judiciary to obtain financial advantages that may be best suited to the political or legislative arms of state and federal government," and stated that Alabama did not have a meritorious claim against the tobacco industry.
In June 1997, national tobacco settlement negotiations began between various state attorneys general and the tobacco industry. The negotiations culminated in a proposed national tobacco settlement agreement that required the approval of the United States Congress. However, the agreement died when Congress failed to approve the settlement. On July 3, 1997, the State of Mississippi announced a settlement of its lawsuit against the tobacco industry. That settlement was not subject to the approval of Congress. On August 25, 1997, the State of Florida announced a settlement of its lawsuit against the tobacco industry. That settlement was not subject to the approval of Congress. On August 27, 1997, Attorney General Pryor sought to obtain assurances from the tobacco industry that Alabama would be afforded the same benefits accorded those states that had filed lawsuits which were ultimately settled. On September 16, 1997, Attorney General Pryor entered into a tolling agreement with Philip Morris, R.J. Reynolds, Brown and Williamson, and Lorillard. Only the provisions for the term of the Agreement appear in the record:
"Term. This Agreement shall terminate on the earlier of (1) the adjournment of the second session of the 105th Congress without enactment of the Proposed Resolution or other global settlement which includes a requirement of a payment to the State of Alabama, or, in the event that the Proposed Resolution or other such global settlement is so enacted but fails to become law because of the failure of the President of the United States to sign it, the date upon which such failure to become law by virtue of such lack of such signature occurs; or (2) termination by either the Attorney General, or the Tobacco Defendants, *425 following sixty (60) days' written notice (if by the Attorney Generals, to all Tobacco defendant counsel of record in the Crozier and University of South Alabama cases; if by the Tobacco Defendants, by letter to the Attorney General). In the event of the failure of the 105th Congress to enact the Proposed Resolution or other global settlement, the parties may by prior mutual agreement extend the term of this Agreement." (Emphasis added.)
On January 16, 1998, the State of Texas announced a settlement of its lawsuit against the tobacco industry. That settlement did not require the approval of Congress. In the spring of 1998, new national tobacco settlement negotiations began. Alabama did not participate in the negotiations nor did Alabama have a representative on the negotiations team, although the chief deputy Attorney General consulted on a daily basis with the negotiations team.
In March 1998, Walter Byars became special counsel to Governor James. Byars worked with the Governor on proposed tobacco legislation and on identifying the options that Governor James and Alabama had to pursue a recovery from the tobacco industry. On April 15, 1998, Byars furnished Governor James with a legal opinion stating that the Governor had the authority to institute litigation against the tobacco industry. Byars recommended that the Governor direct Attorney General Pryor to file the litigation.
On April 27, 1998, the Alabama Legislature passed the Children First Trust Fund Act, § 41-15B-1 et seq., Ala.Code 1975 (Cum.Supp.1999), which requires the Governor to "file any litigation necessary to effectuate the compelling interest of the State of Alabama to recover tobacco-related damages incurred by the state." § 41-15B-2(i), Ala.Code 1975. Governor James directed Byars to prepare a complaint against the tobacco industry. In June 1998, the Governor instructed Byars to find a group of attorneys to handle the litigation against the tobacco industry.[4]
On July 28, 1998, Byars presented Governor James with a proposed complaint on behalf of the State of Alabama against the tobacco industry. The complaint sought to recover money spent by Medicaid, Public Education Health Insurance Plan, State Employment Insurance Plan, other funds, and agencies to treat tobacco-related diseases or illnesses. Governor James tendered the complaint to Attorney General Pryor or his deputy and requested the Attorney General to file the complaint. Attorney General Pryor refused to file the complaint on behalf of the State of Alabama.
Effective July 28, 1998, Byars entered into a contingency fee contract for legal services with the State of Alabama through a contract with Governor James. The contract provided that Byars was to recover money from third-parties whose tobacco products caused or may cause tobacco-related illnesses to recipients of health benefits funded by the state. The contract authorized Byars to associate other attorneys as long as the association of other counsel did not increase the amount of the fee. Byars associated Jere Beasley, E. Ted Taylor, Larry Morris, and Michael J. Evans (herein collectively called "James's attorneys").
Concerned by the Attorney General's failure to act, Governor James asked James's attorneys whether he could file a lawsuit against the tobacco industry. James's attorneys advised the Governor about a "tolling agreement" Attorney General *426 Pryor made with some tobacco companies and about the effect of the Attorney General's failure to have all tobacco companies sign the tolling agreement. While Governor James proposed to file a complaint against the tobacco industry immediately, Attorney General Pryor advised the Governor that such a filing would breach the tolling agreement, which would then cause the statute of limitations to bar any action by the State. Attorney General Pryor advised the Governor to wait to file the complaint until the tolling agreement expired, at the end of the 105th Session of Congress.
In November 1998, James's attorneys completed a final draft of the complaint against the tobacco industry. In an amended contingency contract executed on November 12, 1998, the Governor approved Byars's association of Beasley, Taylor, Morris, and Evans. The amended contingency fee contract contained the following provisions:
"The Attorneys' claims and the Court's award of fees shall not exceed 7.00% of the total amount of recovery, which total amount shall include any monies received by the State of Alabama as a result of this litigation or any settlement of any claims asserted or which could have been asserted in this litigation, whether negotiated by the Governor, the Attorneys or any other party, including any and all damages of any type or nature whatsoever, plus out-of-pocket costs and expenses incurred by the Attorneys. Provided, if a proposed settlement is reached by the Attorney General without the Attorneys' substantial participation, no Attorneys' fees will be paid to the Attorneys.
"This contract, including but not limited to the payment of fees, costs and expenses, shall be governed and controlled by the laws of the State of Alabama and the rules of the Alabama State Bar.
". . . .
"The terms and commitments contained herein shall not be considered as a debt of the State of Alabama in violation of Article II, Section 213 of the Constitution of Alabama 1901, as amended by Amendment Number 26. If any provision of this contract shall contravene any statute or constitutional provision or amendment, then the conflicting provision shall be deemed null and void. Provided, however, Attorney[s] shall be entitled to recover the fees and expenses provided herein only from the recovered proceeds." (Emphasis added.)
Neither the original contingency fee contract nor the amended contingency fee contract was submitted to the Contract Review Permanent Legislative Oversight Committee. See §§ 29-2-41 and 29-2-41.2(b), Ala.Code 1975, hereinafter discussed.
That same day, November 12, 1998, because James's attorneys feared that Attorney General Pryor might have allowed the statute of limitations to run with regard to a major portion of the tobacco industry, including smokeless tobacco, James's attorneys filed the complaint they had prepared in the name of Governor James on behalf of the State of Alabama, immediately following the adjournment of the 105th Congress. The complaint specifically sued 28 tobacco product companies, including smokeless tobacco companies and one cigarette paper manufacturer. The complaint asserted various tort-based counts, including negligence, willfulness, outrage, AEMLD, and conspiracy.
Still later that same day, November 12, 1998, Attorney General Pryor filed a complaint against Philip Morris, R.J. Reynolds, Brown and Williamson, and Lorillard only. The Attorney General's complaint sought damages for breach of contract, but did not seek any equitable relief. Attorney General Pryor's complaint alleged that Philip Morris, R.J. Reynolds, Brown and Williamson, and Lorillard breached a contract by not including Alabama in the national tobacco settlement.
*427 On November 17, 1998, James's attorneys amended their complaint to assert the same breach of contract. That same day, Attorney General Pryor tendered two settlement agreements to Governor James. One agreement settled the State's claims involving smoking tobacco and the other agreement settled the State's claims involving smokeless tobacco. The deadline to accept the settlement offers was November 20, 1998.
James's attorneys reviewed the agreements and objected to the inclusion of the attorneys in Blaylock v. The American Tobacco Company, Montgomery County Circuit No. CV-96-1508, a private class action, to receive payment of attorney fees from the settling tobacco defendants. James's attorneys also reviewed the tolling agreement between the Attorney General and Philip Morris, R.J. Reynolds, Brown and Williamson, and Lorillard to determine whether the claims against some tobacco defendants were barred by the statute of limitations, because those tobacco defendants were not signatories to the tolling agreement.
Governor James refused to sign the settlement agreements because Alabama would receive only $3,000,000,000 or $700 per person, when Mississippi would receive $4,400,000,000 or $1,600 person and Minnesota would receive $6,100,000,000 or $1,300 per person. Because of the statute-of-limitations problems, however, James's attorneys advised the Governor to allow the Attorney General to accept the settlement agreements. Although unsatisfied with the amount of the settlement agreements, Governor James on November 20, 1998, empowered Attorney General Pryor to settle the litigation. Within one hour of receiving authority to settle the litigation, Attorney General Pryor discharged James's attorneys. He amended the settlement agreement, for Alabama only, to exclude the Blaylock case as the "tobacco settlement vehicle," and included the case that he had filed as the settlement vehicle. In Exhibit S to the Master Settlement Agreement, a listing of attorneys to be paid by the tobacco defendants, Attorney General Pryor stated that "`[t]he State of Alabama had no outside counsel.'" Exhibit S, however, does list the attorneys representing Blaylock as being entitled to receive an attorney fee.
On December 11, 1998, Attorney General Pryor, Blaylock, Philip Morris, and the other tobacco companies filed a joint motion for approval of the Master Settlement Agreement. They requested entry of a final consent judgment. On February 26, 1999, the trial court conducted a fairness hearing in the actions filed by Attorney General Pryor, Blaylock, and Governor James. At the fairness hearing, a representative of the Attorney General conceded that Governor James had authority to file the tobacco lawsuit and to hire attorneys to pursue that litigation. On March 3, 1999, the trial court entered a final consent judgment dismissing with prejudice all claims of the State. Likewise, the court dismissed without prejudice all claims in the Blaylock action. The trial court, sua sponte, entered a supplemental order, stating that it was appropriate to compensate James's attorneys for their efforts in the tobacco litigation and directing James's attorneys to file fee petitions.
On March 15, 1999, James's attorneys, except Jere Beasley, filed a joint petition for attorney fees and expenses to be paid by the tobacco defendants or, in the alternative, to be paid by the State. James's attorneys, except Beasley, submitted affidavits delineating, in hours and minutes, the time each spent on the litigation. They also listed the expenses they each incurred. Byars submitted 195.25 hours plus 20.75 hours for his paralegal and expenses of $4,411.51. Evans submitted 125.5 hours and expenses of $2,250. Taylor submitted 249 hours plus "staff time" of 115.25 hours and expenses of $3,682.35. Morris submitted 269.15 hours and expenses of $536. James's attorneys suggested a total fee of $1,939,357 plus expenses.
*428 On March 17, 1999, Attorney General Pryor filed a response challenging the validity of the contingency fee contract on the ground that the contract had not been submitted to the Contract Review Permanent Legislative Oversight Committee. He argued also that James's attorneys were not entitled to a fee under the contract. The Attorney General did not, however, challenge the amount or reasonableness of the attorney fee sought.
On April 9, 1999, the trial court conducted a hearing on the joint fee petition. James's attorneys presented expert testimony from Fred D. Gray, Esq., and John Tabor, Esq. Gray and Tabor both testified regarding the fee petition, the attorney affidavits, the settlement agreements, and the reasonableness of the fee. They also testified about recovery under quantum meruit. Gray testified that a $2,000,000 fee was reasonable under contingency fee contract or under quantum meruit. Tabor testified that the $2,000,000 fee, as stated by Gray, was reasonable under the contingency fee contract or quantum meruit, but that he was prepared to testify in favor of a larger fee. Additionally, Jim Main and Byars both testified about the fee petition and the reasonableness of the requested fee. Attorney General Pryor did not call any witnesses or offer any evidence and did not cross-examine Gray and Tabor. He did cross-examine Main and Byars. Attorney General Pryor did not dispute or object to the amount of the attorney fee requested by James's attorneys and did not dispute or object to the amount of the attorney fee recommended Tabor and Gray. Attorney General Pryor did argue that James's attorneys were not entitled to an attorney fee because the contingency fee contracts were void and because they did not "substantially participate" in the tobacco settlement.
On May 7, 1999, the trial court entered an order stating, in pertinent part:
"The Court has before it, and has considered, the Petition(s) for Attorneys' Fees and Expenses filed by [James's attorneys]; the accompanying affidavits and submissions of all [James's attorneys]; the original contingency fee contract and the amended contingency fee contract with the State; the ore tenus testimony and other evidence presented at a scheduled hearing on April 9, 1999, at 10:30 A.M., with the State of Alabama being represented by the Attorney General and the Deputy Attorney General; and the response of the Attorney General in opposition to the attorneys' fees.
". . . .
"FINDINGS AND CONCLUSIONS
"The evidence is undisputed that the Attorney General had, for more than 1½ years, advised Governor James that a settlement with the tobacco industry was imminent; however, the Attorney General's legislative efforts in Alabama and nationally were unsuccessful; and it was not until sometime after suit was filed by Governor James on behalf of the State of Alabama seeking equitable and tort relief, including damages and injunctive relief against promoting the sale of tobacco to minors, that the settlement agreement which included Alabama were offered to the State for execution as a part of a national settlement. Under the amended contingency contract between the State and [James's attorneys], fees and expenses were to be set by the Court, with a maximum of 7.00% of the total amount of recovery, which `shall include any monies received by the State of Alabama as a result of this litigation, whether negotiated by the Governor, [James's attorneys] or any other party, including any and all damages of any type or nature whatever, plus out-of-pocket costs and expenses incurred by ... [James's attorneys]. Provided if a proposed settlement is reached by the Attorney General without [James's attorneys'] substantial participation, no attorneys' fee will be paid to the Attorneys.'

*429 "This contingency fee contract was in effect when the instant lawsuit was filed by Governor James on behalf of the State and at the time the settlement offer was made to the State of Alabama. [James's attorneys were] not afforded an opportunity to participate in the settlement negotiations with the tobacco defendants. Subsequent to filing this suit, the Attorney General received, and, on November 16 or 17, 1998, tendered to Governor James the proposed settlement agreements relating to smoking and smokeless tobacco for the approval of and execution by the Governor as provided in the Children First Fund Act, with a deadline of November 20, 1998. Governor James unsuccessfully requested an extension of 30 days to analyze the settlement proposals. Upon Governor James' refusal to sign the settlement agreements based on, in his opinion, the inadequacy of the settlement recovery, the consent to pursue or settle was given by Governor James to Attorney General Pryor on November 29, 1998. On that date, [James's attorneys] were notified by the Attorney General that their services were no longer required. `It is well established in Alabama that upon an attorney's discharge, the prior part performance of a contract entitles the attorney to recover for those services rendered.' Triplett v. Elliott, 590 So.2d 908, 910 (Ala.1991). `[A] contingent fee client cannot wait until a favorable settlement offer has been received to discharge the lawyer. In that situation, the lawyer can recover on the contract if the discharge was without cause. See, Kaushiva v. Hutter, 454 A.2d 1373 (D.C.App.1983).' Ala. State Bar Office of General Counsel Ethics Opinion, RO-92-17 (1992).
"The Attorney General executed the settlement agreements on behalf of the State of Alabama but in lieu of the required signature of Governor James, attached Governor James' letter of consent for representation by the Attorney General. The Attorney General on behalf of the State of Alabama invoked the jurisdiction of this Court to consider and approve the settlement. This Court approved the settlement by its ... Order entered March 3, 1999.
"The Attorney General conceded that Governor James had the authority to file this lawsuit and to hire [James's attorneys], and the accuracy of the hours and fees submitted by [James's attorneys], yet offered no evidence to dispute these claims, but relied upon two legal contentions:
"(1) That the contingency fee contract was [void ab initio] for failure to file the contract with the Contract Review Permanent Legislative Oversight Committee relying on Ala.Code § 29-2-41; however, that statute is not applicable to the instant contingency fee contract which was not a contract `to be paid out of appropriated funds.' Accordingly, the Court finds that the contingency fee contract for legal services to be provided by [James's attorneys] was not required to be filed with the Committee. As Governor James possessed statutory authority to enter into contracts for legal services to be performed by [James's attorneys], the contingency fee contracts were valid and were binding on the State of Alabama, at least until terminated by the Attorney General.
"(2) That [James's attorneys] did not substantially participate in bringing about the settlement. The evidence is undisputed that [James's attorneys] made several substantial contributions to bringing about the settlement which constitute `substantial participation' by [James's attorneys]. The undisputed evidence is that the tobacco defendants did not agree to a settlement with Alabama until Governor [James's] lawsuit was filed; this lawsuit was instrumental in bringing about the tobacco settlement with Alabama; [James's attorneys] saved the State from a potential fee claim by attorneys representing plaintiffs in the Blaylock case; [James's attorneys] *430 advised Governor James to consent to the takeover of this litigation and the tobacco settlement by the Attorney General in order to permit settlement to be consummated by the Attorney General on behalf of the State; this litigation included both smoking and smokeless tobacco and sought equitable relief, including injunctive relief against promoting tobacco sales to minors, and presented the only claims by the State against smokeless tobacco defendants; and this litigation made the State potentially eligible for a share or a larger share of the Strategic contribution Fund to be awarded under the settlement agreements in proportion to each state's active participation. The significance of the instant tort litigation filed by Governor James was acknowledged by Counsel for the tobacco industry in their refusal to accept a release of the contract liability pursued by the Attorney General without a final release of liability based on the tort and equitable claims filed by Governor James. Based on the foregoing, the Court finds `substantial participation' by [James's attorneys] in bringing about the settlement approved by this Court.
"The undisputed evidence presented by [James's attorneys], both by affidavits and submissions, and by the ore tenus testimony of fee experts Fred D. Gray, Sr., Esq., and John A. Taber, Esq., support the award, of an attorneys' fee to be shared among [James's attorneys] in the amount of $2 Million as reasonable on a contingency fee basis as provided in the contractual arrangements between the State and [James's attorneys], or based upon [quantum meruit] for services performed applying the factors set out in Peebles v. Miley, 439 So.2d 137 (Ala.1983), and Brown v. State, 565 So.2d 585, 592 (Ala.1990). There is no contradictory evidence.
"The total recovery to be paid to the State of Alabama pursuant to the settlement agreement, without applying any inflation or other factors, is $3.037 Billion to be paid over 25 years, with a payment in the amount of $38,787,140 to be paid in 1999. The award of $2 Million as attorneys' fee is reasonable, representing only slightly more than 6/100ths of 1% (0.06%) of the total recovery, and 5.16% of the recovery to be paid in 1999 under the terms of the settlement.
"Based upon the uncontradicted evidence and the applicable legal principles, the Court finds that [James's attorneys] are entitled to an attorneys' fee of $2 Million to be shared among [James's attorneys], plus out-of-pocket expenses and costs in the total amount of $11,160.36 as itemized.
"ORDER
"Based on the foregoing, it is considered ORDERED, ADJUDGED AND DECREED that:
"(1) [James's attorneys] be and they are hereby awarded and shall have and recover attorneys' fees in the amount of $2 Million, and reimbursement of costs and expenses in the total amount of $11,160.36, to be paid to [James's attorneys] out of the settlement amount of $38, 787,140 to be paid [to] the State of Alabama by the tobacco defendants;
"(2) The tobacco defendants named as parties to this action, and who are parties to the settlement agreements be, and they are hereby directed to pay James's attorneys the sum of $2 Million as attorneys' fees and $11,160.36 as reimbursement of costs and expenses to be paid out of the amount set aside or designated for payment of settlement to the State of Alabama for the year 1999 in the amount of $38,787,140;
"(3) [James's attorneys are] hereby granted a lien in the amount of $2,011,160.36 against the amounts held by the tobacco defendants, or their agents, for payment of the settlement installment of $38,787,140 to be paid to the State of Alabama in 1999 by the *431 tobacco defendants pursuant to the settlement agreements."
Section 29-2-40, Ala.Code 1975, created the Contract Review Permanent Legislative Oversight Committee. The responsibilities of the Committee are stated by § 29-2-41, Ala.Code 1975, as follows:
"The committee shall have the responsibility of reviewing contracts for personal or professional services with private entities or individuals to be paid out of appropriated funds, federal or state, on a state warrant issued as recompense for those services." (Emphasis added.)
That same section also provides, in pertinent part:
"Each contract shall be accompanied by an itemization of the total cost estimate of the contract. The department may, in lieu of the proposed contract, submit to the committee a letter of intent to contract. Such [a] letter of intent to contract shall indicate the contracting parties, the services to be performed, an itemization of the total cost estimate of the contract, and such other information as the department may deem pertinent to the committee review of the contract. The committee shall review and comment where necessary on any such contract or letter of intent to contract within a reasonable time not to exceed 45 days after the department has submitted the contract or letter of intent to contract to the committee. Any contract made by the state or any of its agencies or departments in violation of this section and without prior review by the committee of either the contract or the letter of intent to contract shall be void ab initio." (Emphasis added.)
Thus this section can operate to void only unreviewed contracts to be paid out of appropriated funds on state warrants
The term personal and professional services is defined in § 29-2-41.2 as including "independent contractor agreements as well as individual employment agreements." Subsection (b) of § 29-2-41.2 specifically governs contracts for employment of attorneys to provide legal services to the State or its agencies. That section provides:
"Notwithstanding any other provisions of this article, all contracts for employment of an attorney to provide legal services, including contracts involving an attorney providing legal services under an agreement with the Attorney General, shall be reviewed by the committee. Provided, however, contracts for appointment of attorneys for the Department of Transportation for right of way condemnation cases are exempt from the provisions of this article."
The Attorney General argues that § 29-2-41.2 must be read by itself, not in pari materia with § 29-2-40 and § 29-2-41, and that § 29-2-41.2 voids ab initio the contingency contracts of James's attorneys. Section 29-2-41.2, read by itself, however, does not contain any void-ab-initio provision or, indeed, any sanction at all.
"The cardinal rule of statutory interpretation is to determine and give effect to the intent of the legislature as manifested in the language of the statute. Gholston v. State, 620 So.2d 719 (Ala.1993)." Ex parte State Dep't of Revenue, 683 So.2d 980, 983 (Ala.1996). In determining legislative intent, "the entire Act must be examined and construed as a whole, and, if possible, every word in it given effect." McWhorter v. State Bd. of Registration for Professional Engineers & Land Surveyors ex rel. Baxley, 359 So.2d 769, 771 (Ala.1978). Moreover, "[s]ections of the Code dealing with the same subject matter are in pari materia. As a general rule, such statutes should be construed together to ascertain the meaning and intent of each." Locke v. Wheat, 350 So.2d 451, 453 (Ala.1977) (citations omitted). See also Tuders v. Kell, 739 So.2d 1069, 1072 (Ala.1999), and Lambert v. Wilcox County Comm'n, 623 So.2d 727 (Ala.1993).
Section 29-2-41.2 defines the term "personal and professional services" used in *432 § 29-2-41 and includes contracts for legal services in that term. As already observed, the void-ab-initio provision is contained in § 29-2-41, not § 29-2-41.2, which, if not construed in pari materia with § 29-2-41, contains no penalty at all for failing to submit a contract for the legal services to the Contract Review Permanent Legislative Oversight Committee. The result is exactly the same if §§ 29-2-40, 29-2-41, and 29-2-41.2 are construed in pari materia, as obviously they should be, inasmuch as they all deal with the same subject matter: because the void-ab-initio sanction appears in the very same section that contains the language limiting its application to "contracts for ... professional services with ... individuals to be paid out of appropriated funds ... on a state warrant," the void-ab-initio provision does not apply to any contracts not to be paid out of appropriated funds on a state warrant, like the contingency fee contracts here, which expressly state that James's attorneys' fee is to be paid out of "the recovered proceeds" of the tobacco case settlements.
The trial court correctly determined that the contingency fee contracts between James's attorneys and the State were not subject to review by the Contract Review Permanent Legislative Oversight Committee. Consequently, the contingency fee contracts are not void ab initio or void at all pursuant to §§ 29-2-40, 29-2-41, and 29-2-41.2 for lack of such review.
The amended contingency fee contract states that, "if a proposed settlement is reached by the Attorney General without the Attorneys' substantial participation, no Attorneys' fees will be paid to the Attorneys." Whether James's attorneys' services constituted "substantial participation" in the settlement is a factual question.
The State's argument that James's attorneys did not substantially participate in the settlement of the tobacco litigation is mistaken. Effective April 27, 1998, the Children First Trust Fund Act authorized Governor James only, unless he authorized the Attorney General to act, to pursue litigation against the tobacco industry. § 41-15B-2(i). The Children First Trust Fund Act prohibits the Attorney General from settling any litigation by an executive department or agency under the control of the Governor. Thus, after April 27, 1998, Attorney General Pryor could not reach a settlement with the tobacco industry unless Governor James authorized him to do so. Governor James did not authorize Attorney General Pryor to settle with the tobacco industry until November 20, 1998, when James's attorneys advised the Governor to authorize the Attorney General to accept the settlement offers because of statute of limitations problems resulting from the tolling agreement. Without the research by James's attorneys and their recommendation to the Governor, Attorney General Pryor would not have received the authority to accept the settlement agreements and, without the delegation of authority to settle, Attorney General Pryor could not have concluded the settlements. Moreover, in its order awarding the attorney fee and expenses to James's attorneys, the trial court found their substantial participation as a fact and supported that fact-finding with a detailed description of their participation.
In summary, the law does not invalidate the contingency fee contracts; the record amply supports the trial court's finding that James's attorneys substantially participated in the settlement of the litigation against the tobacco industry; and the State does not challenge either the amount or the reasonableness of the attorney fee, and the record supports the reasonableness of the fee. Thus, the judgment of the trial court awarding a $2,000,000 attorney fee plus costs to James's attorneys should be affirmed.
COOK, J., concurs.
*433 ENGLAND, Justice (dissenting).
I respectfully dissent. While I agree with that portion of the main opinion concluding that the attorneys are entitled to a reasonable fee under the doctrine of quantum meruit, I am not prepared to say what that fee should be. The trial court, based on the evidence before it, concluded that the evidence supported the award of a $2-million attorney fee "as reasonable on a contingency fee basis as provided in the contractual arrangements between the State and State's Counsel, or based upon quantum meruit for services performed." No one offered testimony to rebut the testimony indicating that $2 million was a reasonable fee. I note that the parties now opposing the $2-million fee on this appeal had an opportunity to offer rebuttal testimony at trial but did not do so. "[O]ur review is restricted to the evidence and arguments considered by the trial court." Andrews v. Merritt Oil Co., 612 So.2d 409, 410 (Ala.1992) (citing Rodriguez-Ramos v. J. Thomas Williams, Jr., M.D., P.C., 580 So.2d 1326 (Ala.1991)). Thus, rather than setting a fee itself, this Court should, since it is reversing an order that was based on a finding that the contingency-fee contract was valid, remand this case for an evidentiary hearing so that an attorney fee can be determined under the doctrine of quantum meruit, without the trial court's considering the contingency-fee contract as a factor in setting a reasonable attorney fee.
I note that the trial court made a finding that James's attorneys "made several `substantial contributions' to bringing about the settlement." Although such "substantial contributions" cannot be considered in connection with a determination of whether a fee should be awarded under the contract that the main opinion concludes was void ab initio, such contributions can be considered in determining a reasonable attorney fee under the doctrine of quantum meruit. The result obtained is a factor to be considered under the doctrine of quantum meruit. See Kilgore v. Baker, 361 So.2d 106 (Ala.1978). For the foregoing reasons, I would remand this case with instructions for the trial court to schedule an evidentiary hearing, on an expedited basis, to determine the amount of a reasonable attorney fee based on the doctrine of quantum meruit, and I would further direct the trial court not to consider, as a factor in determining that fee, the contract that the main opinion concludes is void ab initio for noncompliance with Ala.Code 1975, § 29-2-41.
NOTES
[1] This case was originally assigned to another Justice on this Court; it was reassigned to Justice Houston on March 22, 2000.
[2] Only four of these five attorneys are parties to this appealWalter Byars, Ted Taylor, Larry Morris, and Michael Evans. One of the attorneys, Jere Beasley, declined to accept a fee for his services in the case. This Court granted the State's motion to dismiss Mr. Beasley as an appellee; therefore, he is not a party to this appeal.
[3] The question whether § 41-15B-2(i) is constitutional under this Court's holding in Ex parte Weaver, 570 So.2d 675 (Ala.1990), is not before us, and we do not address it.
[4] James Allen Main, Governor James's legal advisor and then executive secretary, testified that, in June 1998, Attorney General Pryor told Governor James that the statute of limitations against the tobacco defendants had run in May 1998 because, in May 1996, Attorney General Pryor had attended a meeting with other state attorneys general and then and there had acquired knowledge of the facts and theories of the fraud claims. Attorney General Pryor told the Governor that, if he filed suit against the tobacco defendants before the termination of the tolling agreement, then the State of Alabama would receive nothing.